TRINA A. HIGGINS, United States Attorney (7939)
TRAVIS K. ELDER, Assistant United States Attorney (11987)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
(801) 524-5682
travis.elder@usdoj.gov

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>ALL FUNDS AND HOLDINGS IN CUSO FINANCIAL SERVICES, L.P. ACCOUNT ENDING 2209, OWNED AND IN THE NAME OF JACK GOUDSWAARD, and<br><br>$45,513.25 SEIZED FROM DAVIS COUNTY SHERIFF'S OFFICE / DAVIS COUNTY JAIL, INMATE ACCOUNT 6277, IN THE NAME OF JACK GOUDSWAARD,<br><br>　　　　　Defendants *in rem*. | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM***<br><br>Case No.  2:23-cv-00515<br><br>Judge |

Pursuant to Supplemental Rule G(2) of the Federal Rules of Civil Procedure, the United States of America alleges this *in* rem complaint for forfeiture:

### NATURE OF THE ACTION

1.　　　This is a forfeiture action under 21 U.S.C. § 881(a)(6), 18 U.S.C. § 981(a)(1)(A), and 31 U.S.C § 5317(c)(2). The United States seeks the forfeiture of the Defendant Properties because they represent proceeds traceable to an exchange of controlled substances and/or were intended to facilitate such an exchange in violation of 21 U.S.C. §§ 841(a) and 846. The

Defendant Properties are also subject to forfeiture under 18 U.S.C. § 981(a)(1)(A) because they were involved in transactions or traceable to such transactions that violated 18 U.S.C. § 1957. The Defendant Properties are also subject to forfeiture under 31 U.S.C § 5317(c)(2) because they were involved in violations of 31 U.S.C. § 5324(a)(1) and (3) or are traceable to funds that were involved in such transactions.

JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1345 and 1355(a) and in rem jurisdiction is proper under 28 U.S.C. § 1355(b).

3.      Venue in this Court is proper under 28 U.S.C. §§ 1355(b)(1)(A) and 1391(b) because acts or omissions giving rise to the forfeiture occurred in the District of Utah and a substantial part of the events giving rise to the forfeiture occurred in the District of Utah.

PARTIES

5.      Plaintiff is the United States of America.

6.      The Defendant Properties are identified as:

- All funds and holdings in CUSO Financial Services, L.P. account ending 2209, owned and in the name of Jack Goudswaard (CUSO 2209); and

- $45,513.25 seized from Davis County Sheriff's Office / Davis County Jail, inmate account 6277, in the name of Jack Goudswaard (DCSO 6277);

(collectively, the Defendant Properties).

7.      CUSO 2209 has not been seized. Contemporaneous with the filing of this complaint, the United States will submit a restraining order application to restrain the funds and holdings in CUSO 2209 until the conclusion of these proceedings.

8.      DCSO 6277 was seized on August 3, 2023, and is currently in the custody and control of the United States Marshals Service.

9.      Jack Goudswaard (Goudswaard), age 58, is the named owner of the Defendant Properties.

## FACTS

10.      The Controlled Substances Act ("CSA") places all substances which are in some manner regulated under federal law into one of five schedules. This placement is based upon the substances' medical use, potential for abuse, and safety or dependence liability. Drugs on Schedules I and II of the CSA have a high potential for abuse.

11.      Schedule I controlled substances include heroin.

12.      Schedule II controlled substances include methamphetamine, cocaine, and fentanyl.

13.      In the United States, only those authorized by the DEA can distribute controlled substances. The DEA has not authorized Goudswaard to distribute any controlled substances.

**A.      Investigation of Goudswaard and related persons' drug trafficking and resulting search warrants.**

14.      In September 2021, TFO Mullen and other investigators were investigating a group of individuals' distributing illegal narcotics, specifically using storage units and hotel rooms to package, distribute and store illegal narcotics. Individuals under investigation included Goudswaard, Pauline Parry (Parry) and Douglas Wamsley, Jr. (Wamsley).

15.      Investigators conducted surveillance from approximately early or mid-2021, until September 29, 2021 (surveillance period), on various storage units and hotels linked to

Goudswaard in the Salt Lake Valley. During the surveillance period, investigators observed Goudswaard, Parry, and others coming and going from the same hotels and storage units and appeared to be working together. Investigators specifically observed Goudswaard, Parry, and other unidentified persons going into and out of a motel room on various days and at various times of the day and night at an Econolodge motel near the Salt Lake City Airport. Goudswaard and the additional unidentified individuals were at the motel room at the same time on several occasions but did not travel in the same vehicles to or from the motel. During the surveillance period, detectives saw Goudswaard driving a yellow Harley-Davidson motorcycle and Parry driving a Toyota Camry. Detectives observed Wamsley driving a Jaguar and associating with Goudswaard.

16.     Investigators saw Goudswaard driving the yellow Harley-Davidson and Wamsley driving the Jaguar, enter and exit the secured-code-only entrance and exit of Diamond Storage, a storage unit business at 50 South Redwood Road, Salt Lake City, Utah.

17.     On September 7, 2021, investigators observed Wamsley drive into the storage unit entrance, enter a code in the code box, and then drive into the property when the gate opened. After approximately one hour, Wamsley left the area and investigators saw him engaging in a hand-to-hand transaction with an unidentified female. In the experience of investigators, drug traffickers often engage in hand-to-hand transactions when exchanging money for drugs. After this transaction, the unidentified female appeared to be using drugs inside her vehicle. Immediately after the hand-to-hand transaction, Wamsley drove and met with Goudswaard.

18.     Video surveillance at Diamond Storage showed either Goudswaard or both Goudswaard and Wamsley, on various dates, entering and exiting Diamond Storage via the entrance gate. Video footage also depicted Parry coming and going in a white van as well as the above-described Camry.

19.     Video surveillance at Diamond Storage also showed Goudswaard, Parry, and Wamsley driving into and out of that storage area at various times of day and night and spending differing amounts of time at the storage unit. On some occasions, they let in additional unidentified parties driving different vehicles. A Diamond Storage employee told investigators that Goudswaard and the additional parties commonly came at late night hours, which was abnormal and suspicious.

20.     Rental information for Diamond Storage showed Goudswaard was the renter of unit H14, Parry was the primary renter of unit H8, and Goudswaard was the secondary renter of unit H8. Unit H14 was first rented by Goudswaard in August of 2021. Both unit H14 and unit H8 had been rented by Goudswaard, and Goudswaard and Parry, through the end of September 2021 prior to the below-described service of a search warrant at Diamond Storage.

21.     On another occasion, investigators saw Goudswaard and Wamsley doing hand-to-hand transactions immediately after leaving Diamond Storage. After this, Goudswaard and Wamsley went to the area of the Ramada Inn near the Salt Lake City International airport. On several separate occasions, detectives saw Goudswaard, Wamsley, and Parry, together at the Ramada Inn in Salt Lake City. Detectives saw them entering and exiting the same motel room.

22.     On September 29, 2021, investigators served a search warrant at the Alta Motel, room 31. The Alta Motel is located at 1899 South State St., Salt Lake City, Utah. During the

service of the search warrant, distributable amounts of heroin and methamphetamine were located. Throughout the course of the investigation, detectives had determined that the occupant of room 31 was being supplied narcotics by Wamsley who was associated with Goudswaard.

23.     Investigators interviewed Ryan Zipp (Zipp) during the execution of the search warrant. Zipp said the occupant of room 31 obtained his narcotics from Wamsley who in turn obtained them from "Jack" (Goudswaard). Zipp said that he heard Wamsley say his drug supplier was "Jack" and that "Jack" drives a motorcycle. Zipp described "Jack" as being white and in his 50's. He also said that "Jack" bounces from different hotels and that he heard "Jack" stores his drugs in storage units. When asked about the location of the storage unit, Zipp said he did not know but that he believed it might be in Price.

24.     On September 29, 2021, investigators executed a Utah State search warrant on Diamond Storage units H14 and H8. Prior to executing the search warrant, investigators saw Goudswaard and Parry at unit H14. After investigators saw Parry open the door to unit H14 they executed the search warrants and contacted Goudswaard and Parry.

25.     During the search warrant service, detectives seized $5,999 in cash, 11.9 pounds (gross weight) of methamphetamine, and 3 pounds (gross weight) of suspected heroin. The seized narcotics had a street value of approximately $405,000. The seized drugs were tested by the Utah State Crime Lab which confirmed the presence of methamphetamine and heroin that was mixed with fentanyl.

26.     Later on September 29, 2021, investigators executed a Utah State search warrant at room 414 of the Hyatt Motel, near the Salt Lake City airport after learning from Goudswaard and Parry were staying there. Goudswaard and Parry indicated they were no longer staying at the

Econolodge. During the search of room 414, detectives seized $31,659 in cash, 573.7 grams of methamphetamine (gross weight), and 40.8 grams of heroin (gross weight). The seized narcotics had a street value of approximately $32,000. The seized drugs were tested by the Utah State Crime Lab which confirmed the presence of methamphetamine and heroin.

27.     During the execution of the search warrant at Diamond Storage, investigators interviewed Goudswaard. Prior to asking questions, they informed Goudswaard of his Miranda rights, which he waived, and agreed to answer investigators' questions. Goudswaard was not arrested on the date of the search warrants. Investigators also had multiple consensual conversations with Goudswaard as he was willing and wanted to provide information. Some of the conversations with Goudswaard occurred several days after the warrant service on September 29, 2021.

28.     Goudswaard told investigators that he paid $25,000 to purchase methamphetamine every one to two months in Arizona through an unknown individual in Mexico. The methamphetamine was delivered to him in Arizona when he arrived. Goudswaard said he purchased heroin through another unknown individual in Mexico who sent the heroin to Goudswaard in Utah by courier. Goudswaard said he commonly met the courier around 2700 South 4500 West in Sat Lake County. Goudswaard said he purchased heroin approximately once a week and paid $6,300 for eight ounces of heroin.

29.     Goudswaard told investigators when he purchased large quantities of methamphetamine in Arizona, he had someone else drive him back to Utah. Upon arriving in Utah, Goudswaard said he put the illegal narcotics into the storage unit (believed to be the

Diamond Storage units). Goudswaard admitted he had regular customers in the Salt Lake Valley who he would sell the product (drugs) too.

30.     Goudswaard said he sold drugs to support his heroin drug habit that consisted of three to four grams a day. He confirmed he did not currently have a job and used the money he made through drug sales to "live." Goudswaard said he did not have a residence but lived at various motels. Goudswaard said that since his most recent release from prison, it (selling drugs) is the only thing Goudswaard has done to make money. Utah Department of Corrections information indicates Goudswaard was released from prison on April 16, 2019. Goudswaard explained that selling drugs is the only way he knows how to make money and that it would be impossible for him to get an actual job based on Goudswaard's life experience and prison time. Goudswaard said that he had made a bit of money after being injured in a car accident but that he had since spent all that money and reiterated selling drugs was all he knew.

**B.     Federal Indictment of Goudswaard for Illegal Drug Distribution**

27.     Related to the above investigation, Goudswaard was indicted on December 22, 2021, in *United States v. Jack Goudswaard*, No. 2:21-cr-00527 in the District of Utah. The indictment charges Goudswaard, and his two co-defendants, Parry and Wamsley,[1] with three felony counts of possession of a controlled substance (heroin, methamphetamine, and cocaine) with intent to distribute in violation of 21 U.S.C. § 841(a)(1).

28.     On March 26, 2022, Goudswaard was arrested and taken into custody on an outstanding federal warrant from the December 22, 2021 indictment. Since his arrest on March

---

[1] After indictment, Wamsley died of natural causes.

26, 2022, Goudswaard has been detained under federal custody, first at the Salt Lake County Jail (SLCO Jail) and then at the Davis County Jail.

29.     A superseding indictment was filed against Goudswaard and Parry in the same criminal case. This indictment charged each with possession of methamphetamine with intent to distribute – aiding and abetting in violation of 21 U.S.C. § 84(a)(1) and 18 U.S.C. § 2.

30.     On August 1, 2023, codefendant Parry pled guilty to one count of possession of methamphetamine with intent to distribute and aiding and abetting. In the Defendant's Statement in Advance of Plea of Guilty, Parry admitted:

> On or about September 29, 2021, in the District of Utah, I knowingly and intentionally aided and abetted in the knowing and intentional possession of methamphetamine. More specifically, on that date, I provided a hotel room which Jack Goudswaard utilized for storage and packaging of methamphetamine for distribution. Jack Goudswaard intended to distribute the methamphetamine to others. I knew Jack Goudswaard was engaged in this conduct and I intended to help him bring it about by providing a hotel room for him, knowing he used the room for the storage and packaging of methamphetamine. Methamphetamine is a Schedule II controlled substance. I acknowledge that my conduct violated 21 U.S.C. § 84l(a)(l) and 18 U.S.C. § 2.

## C.     Investigation of Goudswaard's Jail Phone Calls

31.     In January 2023, TFO Mullen began investigating Goudswaard's finances to uncover how drug proceeds were moved to facilitate drug distribution and to identify any assets used to facilitate the drug distribution operation.

32.     In recordings of Goudswaard's phone calls at the SLCO Jail between March 26, 2022 and June 2023, Goudswaard is heard discussing the movement of money including with two women who frequently called and visited Goudswaard in jail, Mickey Matthews (Matthews) and Rebekah Thomas (Thomas).

33.     In several of Goudswaard's phone calls with Matthews and Thomas, their conversations referenced "commissary." A review of SLCO Jail records for Goudswaard's commissary account show that on March 6, 2023, he had a balance of $48,744.50 (DCSO 6277). In the experience of investigators, this amount was an unusual and abnormally large sum of funds for an inmate to have in a commissary account at the jail since such accounts are only meant to purchase items such as snack foods, writing paper, stamped envelopes, toiletries, playing cards, greeting cards, art materials, personal hygiene items, and other similar items.

34.     The jail phone recordings also revealed Goudswaard directing Matthews and Thomas to transfer specific amounts of money—believed to be drug proceeds—from and to accounts he specifically identified. Goudswaard also directed the women to use funds from certain accounts to pay his bills and debts.

35.     In one instance, Goudswaard instructed one of the women to make a payment to Apex Storage in Sandy, Utah. Records obtained from Apex Storage show that Goudswaard and Matthews signed a rental agreement for self-storage unit 37 in, or about, March 2014, and consistently paid for storage fees with cash. Such cash payment totaled $12,3000 between March 2014 and March 2023.

36.     During a jail call in 2022, Goudswaard talked to Thomas about giving her a power of attorney so that she could make withdrawals from his jail account (DCSO 6277) and move the funds to other locations. In a phone call on October 29, 2022, Goudswaard and Thomas discussed the purchase of a house and how Thomas had been searching for a property to buy. Goudswaard said that he would release money to her on her next visit and that he would have a *good down payment*. In response, Thomas suggested that they save the money for retirement

instead of using it towards the house, and asked Goudswaard, "why put 30 thousand down for a down payment if you don't have to?" Goudswaard replied that he had at least one hundred thousand dollars.

37.     On March 18, 2023, during another jail call on the same subject, Thomas stated she liked "little chunks" of money but didn't want "big chunks."

38.     During the same period in jail calls between Goudswaard and Matthews, Goudswaard asks Matthews to move specified amounts of money for him. The following are examples of such requests by Goudswaard to Matthews:

        a.      In a phone call on April 14, 2022, Matthews told Goudswaard that she had gone to the "unit" and removed some "hundreds" and put "it back the way it was." Matthews also implied that other parties were accusing her of taking a larger amount of the concealed cash. Matthews says that she "took the egg" (in the experience of investigators, a common way among traffickers to describe a large sum of illegal narcotics) and indicated people should not be pointing the finger at her.

        b.      Also on April 14, 2022, Matthews indicated that her mother was holding cash for Goudswaard, and she asked him if he wanted her to move it to another location. Goudswaard told Matthews to "put at least 20 grand on my books so I can have money for a lawyer." Matthews asked if she should just pay for the lawyer, but Goudswaard ignored her question and said, "after that just start dumping it into the bank." Matthews asked Goudswaard to write out his instructions and send them to her in the mail. Goudswaard told her that she could, and that "of course you can keep a couple grand for yourself." In the same conversation, Goudswaard stated that "Mike" (unidentified male)

told him money was missing but added, "I think he was talking about the 70 grand I left there."

c.     In a phone call on July 3, 2022, Goudswaard talked with Matthews about "Jimmy." Matthews said "Jimmy" was in a car, in a meeting, and he is a busy dude. In response, Goudswaard said, "I bet it was cool when ya gave him one hundred thousand dollars." Goudswaard mentioned that he had written "Jimmy" a letter and wanted to know what's going on. Matthews said she "made it there the next morning…stayed up all night." Goudswaard thanked Matthews for going "down there," which investigators understood to mean Matthews travelled down to "Jimmy" to give him $100,000 in cash.

d.     In a phone call on July 5, 2022, Matthews explained to Goudswaard that the bank told her that she was not allowed to continue making $8,000 cash deposits into Goudswaard's bank account. The bank told her this was suspicious because the bank was aware that Goudswaard was incarcerated. Goudswaard then told Matthews to make $8,000 deposits at various ATM locations. Matthews responded, "ya know how many banks I would have to go to put 8 thousand dollars on a card (referring to a visa card)?" Matthews expressed her concern with the transactions Goudswaard was directing her to make for him because the banks were "questioning the [expletive] out of me that day." The Bank Secrecy Act requires financial institutions to file Currency Transaction Reports with the Financial Crimes Enforcement Network related to cash deposits exceeding $10,000. To avoid this filing requirement, those involved in criminal activity will break up cash deposits into multiple deposits below the filing threshold at the same bank or

different banks. Avoidance of the Bank Secrecy Act filing requirements is sometimes used by those laundering money to avoid law enforcement scrutiny.

       e.      In a phone call on July 12, 2022, Goudswaard told Matthews to remove a large sum of money from a location, and to add it to his books at the SLCO Jail.

39.      Security video recordings at SLCO jail captured images of Matthews making cash deposits on June 6, June 30, and August 2, 2022. These deposits correlate to three $5,000 cash deposits into DCSO 6277 on the same dates. DCSO 6277 records show that Matthews deposited a total of $20,000 cash into that account. The balance of DCSO 6277 as of July 26, 2023, was $45,604.09.

## D.    Investigation and Analysis of Goudswaard's Bank and Commissary Accounts (CUSO 2209 and DCSO 6277)

40.      Agents conducted extensive research to identify financial accounts held by Goudswaard including FinCEN queries, the issuance of subpoenas to banks and financial institutions, and analyzing financial evidence for additional financial leads. To date, agents obtained bank records from January 2020 to approximately the end of March 2023. Through the financial investigation, and my investigation of Goudswaard, agents identified numerous financial accounts including CUSO 2209 and DCSO 6277.

41.      Agents identified the following financial accounts relating to Goudswaard:

       a.      America First Credit Union Accounts ending 7394 (savings, "AFCU 7394") and 9937 (checking, "AFCU 9937"). Goudswaard opened AFCU 7394 on October 15, 2019, and AFCU 9937 on March 25, 2021. The applications for these accounts listed Mickey Matthews as Goudswaard's girlfriend. The applications also listed

Goudswaard's employment as self-employed, with an occupation of property maintenance for five years.

      b.     CUSO 2209. Goudswaard opened CUSO 2209 on May 12, 2021. This investment account was originally assigned account number ending 0595. CUSO is currently associated with Atria Wealth Solutions. CUSO changed the account number from an account ending in 0595 to one ending in 2209, as of an account statement covering October 24, 2022, to November 30, 2022. This account change may have resulted because CUSO changed affiliation from America First to Atria Wealth Management. The account application lists Goudswaard as self-employed in property management with $4,000 a month in income.

      c.     Cyprus Credit Union Account ending 4913 ("Cyprus 4913"). Goudswaard opened this account on October 24, 2020. The signature card lists, "Construstion [sic] at Your Service," as Goudswaard's occupation. Matthews is listed as "Payable on Death" beneficiary.

      d.     DCSO 6277. The initial transaction in Goudswaard's jail commissary account occurred on March 26, 2022, when he was booked into the Salt Lake County Jail. As detailed later, Goudswaard's inmate commissary account was transferred to several correctional institutions as Goudswaard was transferred. DCSO 6277 was an account in Goudswaard's name that was maintained by the Davis County Sheriff's Office / Davis County Detention Center for commissary and other purposes. As of July 26, 2023, the balance of DCSO 6277 was $45,604.09.

e.     First Utah Bank Account ending 7399 ("FUB 7399"). Goudswaard opened

FUB 7399 on November 29, 2013. On May 17, 2022, in a Utah Statutory Form Power of

Attorney, Goudswaard designated Matthews as his agent regarding "banks and other

financial institutions." The power of attorney was filed with First Utah Bank. First Utah

Bank closed the account on July 29, 2022. A letter from First Utah Bank to Goudswaard

and Matthews stated the reasons for closure as: "unwilling to provide source of cash

funds" and "unable to verify source of funds for deposit."

f.     Mountain America Credit Union Account ending 2809 ("MACU 2809").

Goudswaard opened MACU 2809 on July 23, 2020, originally under an account ending

7960. MACU changed the account number to prevent fraud on the original account.

MACU 2809 had various sub-accounts, such as Primary Savings, Secondary Savings,

Money Market, and Myfree Checking.

42.     Agents analyzed the financial accounts to identify cash deposits from January

2020 through December 31, 2022. In total, the financial accounts received approximately

$152,125 in cash deposits during that time as summarized in this table:

| TABLE 1 | | | | |
|---|---|---|---|---|
| ANALYSIS OF CASH DEPOSITS TO GOUDSWAARD ACCOUNTS | | | | |
| **BANK/INSTITUTION** | **2020** | **2021** | **2022** | **TOTALS** |
| AFCU 7394 | $31,991 | $7,077 | | $39,068 |
| AFCU 9937 | | $4,580 | | $4,580 |
| CUSO 2209 | | | | $0 |
| Cyprus 4913 | $8,588 | $12,906 | | $21,494 |
| DCSO 6277 | | | $21,617 | $21,617 |
| FUB 7399 | $13,798 | $3,156 | $16,000 | $32,954 |
| MACU 2809 | $9,301 | $12,417 | | $21,718 |
| MACU 7960 | $2,148 | $8,546 | $0 | $10,694 |
| | | | | |
| **TOTALS** | $65,826 | $48,682 | $37,617 | $152,125 |

43.     Most of the deposits to the AFCU accounts involved ATM deposits that did not include a deposit slip indicating whether the deposit was cash, check, or otherwise. This is likely because check deposits usually generate a deposit slip while cash deposits at AFCU do not. Consequently, deposits listed in Table 1 did not have deposit slips and so investigators presumed them to be cash deposits.

44.     CUSO 2209 did not receive direct deposits of cash. However, the deposits it received were traceable to cash deposits into Goudswaard's other financial accounts.

45.     Investigators also reviewed Goudswaard's financial accounts for indicators of legitimate employment such as deposits related to payroll checks, electronic payroll deposits, and deposits from businesses that could be for subcontract work. Investigators did not find any deposits related to legitimate income in Goudswaard's financial accounts. Instead, deposit activity in Goudswaard's financial accounts related to cash deposits, economic impact payments from the IRS, and deposits that appeared to be from online gambling activity.

46.     Agents obtained wage and employment information from the Utah Department of Workforce Services (DWFS) for a period of January 1, 2020, to January 26, 2023, on Goudswaard. The DWFS is a government agency in Utah that provides various services including unemployment benefits. In aid of that purpose, Utah requires employers to report quarterly gross wages paid to each employee to the DWFS. The DWFS found no employment records for Goudswaard, or records of wages being paid to Goudswaard during the above period. The DWFS does not receive information regarding self-employment income.

47.     Investigators also requested Utah State tax records, including individual and sales tax returns for December 1, 2020, to January 31, 2023, from the Utah State Tax Commission on

Goudswaard. The Utah Tax Commission found no individual tax returns, business sales tax returns, or affiliated business tax returns for Goudswaard.

48.     As detailed above, Goudswaard also admitted to investigators his primary source of income since his release from prison (April 16, 2019) was from the distribution of drugs.

49.     As previously stated, CUSO 2209 was opened by Goudswaard on May 12, 2021. On March 31, 2023, the ending balance of the CUSO 2209 was $28,735.36. CUSO 2209, and its balance of $28,735.36, was solely funded by a $30,000 transfer from AFCU 9937 on approximately May 17, 2021. These funds have remained in the CUSO 2209 since May 17, 2021, and it appears that the balance has decreased from market fluctuations. Records for CUSO 2209 do not reflect any other deposits or withdrawals made by Goudswaard.

50.     To determine if the $30,000 transferred from AFCU 9937 to CUSO 2209 involved drug proceeds, investigators analyzed AFCU 9937. As detailed in Table 1 above, AFCU 9937 received $4,580 in cash deposits in 2021. The primary funding for the $30,000 transfer from AFCU 9937 to the CUSO 2209, as detailed in the previous paragraph, was a $38,577.53 transfer from AFCU 7394 to AFCU 9937 on May 11, 2021. Approximately seven days after this transfer, $30,000 was transferred from AFCU 9937 to the CUSO 2209.

51.     Next, investigators analyzed AFCU 7394. As detailed in Table 1 above, AFCU 7394 received a total of $39,068 in cash deposits in 2020 and 2021. The $39,068 in cash deposits were the source of the funds used for the $38,557.53 transfer from AFCU 7394 to AFCU 9937; and then the $30,000 transfer from AFCU 9937 to the CUSO 2209.

52.     A commissary account was opened on March 26, 2022, when Goudswaard was arrested and booked into the SLCO Jail on federal drug charges from the federal indictment filed

on him in the District of Utah on December 22, 2021. Goudswaard possessed $1,117 in cash when he was arrested, and those funds were deposited into a commissary account upon arriving at the SLCO Jail. On June 14, 2023, the balance of the commissary account was $46,981.24. The $46,981.24 in Goudswaard's commissary account at the SLCO Jail was funded by four cash deposits of $5,000 totaling $20,000 made by Matthews, a $29,322.12 check from Goudswaard's FUB 7399, and $465 in miscellaneous deposits.

53.     Matthews deposited $5,000 in cash to Goudswaard's SLCO Jail commissary account on April 18, 2022, June 6, 2022, June 30, 2022, and September 6, 2022, totaling $20,000. As detailed in prior paragraphs, Goudswaard directed Matthews to make deposits including deposits to his jail account and Matthews was captured on jail surveillance footage making cash deposits.

54.     Agents analyzed FUB 7399 which funded Goudswaard's SLCO Jail commissary account with a $29,322.12 check on August 4, 2022. As detailed in Table 1 above, FUB 7399 received a total of $32,954 in cash deposits in 2020, 2021, and 2022. Two cash deposits of $8,000 were made into FUB 7399 on June 15, 2022, and June 21, 2022, which is after Goudswaard was booked into the SLCO Jail on March 26, 2022. As detailed in the July 5, 2022 jail call above, Matthews told Goudswaard that the bank told her that she was not allowed to deposit $8,000 anymore and that the bank deemed Matthews' deposit activity suspicious. The $32,954 in cash deposits were the source of the funds used for the $29,322.12 check from FUB 7399 to Goudswaard's SLCO Jail commissary account.

55.     Since March 26, 2022, Goudswaard has been transferred to other correctional facilities. On approximately June 14, 2023, Goudswaard was transferred from the SLCO Jail to

the Nevada Southern Detention Center ("NSDC") in Pahrump, Nevada. On approximately July 5, 2023, Goudswaard was transferred from the NSDC to the Davis County Correctional Facility ("DCCF") in Farmington, UT where he remains incarcerated today. The funds in Goudswaard's SLCO Jail commissary account were transferred to the Davis County Jail.

56.     On or about August 3, 2023, pursuant to a federal seizure warrant, the United States seized $45,513.25 from DCSO 6277, which are funds that were transferred from and traceable to Goudswaard's SLCO Jail commissary account.

### FIRST CAUSE OF ACTION
### 21 U.S.C. § 881(a)(6)
### (Forfeiture of property purchased with drug trafficking proceeds)

57.     The United States reasserts all allegations previously made.

58.     Under 21 U.S.C. § 881(a)(6), "moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of" 21 U.S.C. § 801 et seq. are subject to forfeiture.

59.     Under 21 U.S.C. § 841(a), it is "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." An attempt or conspiracy to do the same is also prohibited by 21 U.S.C. § 846.

60.     As set forth above, the Defendant Properties represent proceeds of the sale of controlled substances in violation of 21 U.S.C. §§ 841 and/or 846 and/or facilitated such violations. These properties are therefore subject to forfeiture pursuant to 21 U.S.C. 881(a)(6).

**SECOND CAUSE OF ACTION**
**18 U.S.C. § 981(a)(1)(A)**
**(Forfeiture of property involved in money laundering)**

61.     The United States reasserts all allegations previously made.

62.     Under 18 U.S.C. § 981(a)(1)(A) all property, real or personal, involved in a

transaction in violation of 18 U.S.C. § 1957, or any property traceable to such property is subject

to forfeiture.

63.     Under 18 U.S.C. § 1957 it is a crime to knowingly engage or attempt to engage in

a monetary transaction in criminally derived property that has a value greater than $10,000 and is

derived from specified unlawful activity.

64.     Under 18 U.S.C. § 1956(c)(7)(A) and 18 U.S.C. § 1961(1)(D), "specified

unlawful activity" is defined to include any "offense involving . . . felonious . . . buying, selling,

or otherwise dealing in a controlled substance . . . punishable under any law of the United

States."

65.     As set forth above, the Defendant Properties were involved in monetary

transactions in violation of 18 U.S.C. § 1957. Specifically, some of the funds and/or holdings

constituting the Defendant Properties are traceable to monetary transactions in criminally derived

property of a value greater than $10,000 in proceeds from specified unlawful activities (21

U.S.C. §§ 841 and/or 846). The Defendant Properties are therefore subject to forfeiture to the

United States under 18 U.S.C. § 981(a)(1)(A).

**THIRD CAUSE OF ACTION**
**31 U.S.C. § 5317(c)(2)**
**(Forfeiture of property involved in structuring)**

66.     The United States reasserts all allegations previously made.

Page **20** of **23**

67.     Under 31 U.S.C § 5317(c)(2) any property involved in a violation of 31 U.S.C. § 5324, and any property traceable to any such violation is subject to forfeiture.

68.     Under 31 U.S.C. § 5324(a)(1) it is an offense to cause a domestic financial institution to fail to file a report required by 31 U.S.C. § 5313 and its accompanying regulations.

69.     Under 31 U.S.C. § 5324(a)(3) it is an offense to structure currency transactions with a domestic financial institution for the purpose of evading the reporting requirements of 31 U.S.C. § 5313 and its accompanying regulations.

70.     As set forth above, some of the funds and/or holdings that constitute the Defendant Properties were involved in violations of 31 U.S.C. § 5324(a)(1) and (3) or are traceable to funds that were involved in such transactions.

71.     The Defendant Properties are therefore subject to forfeiture under 31 U.S.C. § 5317(c)(2).

## REQUEST FOR RELIEF

WHEREFORE, the United States respectfully asserts that the Defendant Properties are forfeitable to the United States under 21 U.S.C. § 881(a)(6), 18 U.S.C. § 981(a)(1)(A), and 31 U.S.C § 5317(c)(2).

The United States further requests:

A.     That the court enter the judicial restraining order applied for contemporaneously with this complaint such that an arrest warrant in rem to seize CUSO 2209 will not be necessary as provided in Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Rule G(3)(b)(iii).

B.      That, pursuant to the Supplemental Rules for Admiralty or Maritime Claims

and Asset Forfeiture Actions, Rule G(3)(b)(ii), the Clerk of the Court issue a

Summons and Warrant of Arrest in Rem as to DCSO 6277.

C.      That Notice of this action be given to all persons known or thought to have an

interest in or right against the Defendant Properties;

D.      That a Judgment of Forfeiture be decreed against the Defendant Properties;

E.      That upon the issuance of a Judgment of Forfeiture, the United States

Marshals Service or its delegate be able to dispose of the Defendant

Properties according to law; and

F.      That the United States receives its costs of court and all further relief to

which it is entitled.

Dated this 10th day of August, 2023.

TRINA A. HIGGINS
United States Attorney

TRAVIS K. ELDER
Assistant U.S. Attorney

## VERIFICATION

I am a Task Force Officer with the Drug Enforcement Administration. As a Task Force Officer with the DEA, my duties and responsibilities include participating in the investigation and prosecution of persons who violate federal laws.

I have read the contents of the foregoing Complaint for Forfeiture *In Rem* and verify under penalty of perjury pursuant to 28 U.S.C. § 1746 that the statements contained therein are true and correct to the best of my knowledge and belief.

Executed on this 10th day of August, 2023.


_____
SARAH E. MULLEN, Task Force Officer
Drug Enforcement Administration